**William Michael PROCTOR, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 01–08–01041–CR.**

Court of Appeals of Texas, Houston (1st Dist.).

June 24, 2010.

Published in Part Pursuant to Tex. R. App. P. 47.

Reconsideration En Banc Denied Aug. 5, 2010.

---

Thomas A. Martin, Houston, TX, for Appellant.

Eric Kugler, Assistant District Attorney of Harris County, Houston, TX, for Appellee.

Panel consists of Justices KEYES, HANKS, and HIGLEY.

## OPINION

EVELYN V. KEYES, Justice.

A jury convicted appellant, William Michael Proctor, of capital murder.[1] The trial court sentenced appellant to life in prison without parole. In seven points of error, appellant contends that: (1) the evidence was legally insufficient to support the verdict; (2) the evidence was factually insufficient to support the verdict; (3) the trial court erred in not granting his motion for a new trial; (4) the trial court erred in not providing an *in camera* review on his motion to require disclosure of the identify of an informant relating to a Crime Stoppers tip; (5) the trial court erred in admitting a suggestive photo array shown to two witnesses; (6) the trial court improperly admitted hearsay evidence during the direct examination of Detective M. Miller; and (7) he received ineffective assistance of counsel.

We affirm.

## BACKGROUND

The complainant, Rosendo Rios, owned the El Ranchito nightclub in southwest Houston. On the night of June 10, 2007, two men entered Rios's bar, one man, appellant, was a tall white man and the other was an African–American. The men had visited the bar individually on the Friday and Saturday nights before the murder.

---

1. *See* Tex. Penal Code Ann. § 19.03(a) (Vernon 2003) (providing elements for capital murder).

On the night of June 10, the two men entered and exited the bar numerous times, but were on the property for around two hours. After having been at the bar for nearly two hours, appellant and his co-conspirator exited the bar, approached a taco stand, and appellant committed two robberies at gunpoint. As these robberies occurred, Rios's employee in the taco stand used a special signal that alerted him, through security cameras, that something was wrong. Rios left his office, went out the back door of the bar, and walked towards the taco stand. As appellant completed the robberies, his co-conspirator entered the taco stand and took approximately $140 from the register. Appellant approached the front of the taco stand and fired his gun, killing Rios. After appellant shot Rios, he attempted to enter the taco stand, but his co-conspirator restrained him, and the two ran to a car and fled.

Police officers arrived seven minutes later. Detectives M. Miller and A. Belk, of the Houston Police Department, were assigned to the case.

The two principal witnesses, Alma Urbina, the employee in the taco stand, and Irma Ibarra, a bartender, described appellant to the detectives. The detectives established a third party as a potential suspect, and put a photo of him into a photo array that they showed to Urbina. Urbina could not identify anyone in the array as the shooter.

On June 25, the detectives had Urbina and Ibarra describe appellant to a police sketch artist, who produced a sketch. Officials from the police department also contacted Schepps Dairy, a subsidiary of Dean Foods, a public corporation that financially supports Crime Stoppers. Schepps volunteered a $5,000 reward for anyone who would provide the police department with information on the shooting. The police publicized the sketch and the reward in the local media on June 25, 2007. On June 26, the police received a tip indicating that the killer lived at 2530 Copper Valley, in Houston, Texas.

The detectives went to the address provided by the tipster and spoke with an African–American woman, Carolee Proctor. After denying that a white male lived in the apartment, Proctor invited the detectives inside. While in the apartment, the detectives saw a photograph of Proctor and appellant hugging. Proctor admitted to the detectives that she was married to appellant, but told the detectives that he was in Louisiana with his sister and that she did not know his cell phone number. Approximately fifteen minutes after the detectives left Proctor's apartment, appellant called them. He told Detective Belk that he was in Louisiana and implied that he had been in Louisiana when the murder occurred.

On July 5, appellant consented to come to the police station to speak with the officers. While he was in the police station, the officers took photos of appellant's face and his tattoos. The detectives put appellant's photo into a new photo array, and Detective Miller showed that array to Urbina and Ibarra, both of whom identified appellant as the shooter. Detective Miller asked the complainant's brother, Leroy Rios, to translate for him when he showed the photo array to Ibarra and Urbina. The complainant's widow was also present for both identifications.

The State obtained an indictment against appellant for capital murder alleging that appellant killed Rios with a gun while attempting to rob Alma Urbina. On July 11, 2007 the police arrested appellant. Following his arrest, appellant was placed in an area of the jail that also housed an acquaintance of his, Joseph Adams.

Before trial, appellant filed a motion to discover the identity of the person who provided the tip in which the police learned appellant's address. Appellant claimed that Schepps was not a Crime Stoppers organization, so that information provided to it was not privileged, and that the identity of the person who provided the tip was exculpatory and thus he was entitled to it. He requested a hearing and *in camera* review of the information in the Crime Stopper's tip. Schepps and the State filed motions to quash. The trial court held a hearing in which appellant's counsel claimed he believed the information was exculpatory because appellant was being "set up." The trial court granted the motion to quash without conducting an *in camera* review.

Prior to trial, appellant also filed a motion to suppress the photographic identification based on Urbina's and Ibarra's identification of appellant from the photo array. The trial court carried the motion with the trial. During trial, the trial court held hearings on the photo array outside of the presence of the jury. It found Detective Miller and Ibarra credible and allowed them to testify about the photo array and to identify appellant in court. The trial court did not enter findings on Urbina's credibility, but it allowed her to testify to the photo array and to identify appellant in court.

At trial, the State called twelve witnesses and the defense called nine. The State first called Ibarra. She testified that on the night of the murder she was working as a bartender in Rios's bar. Appellant and an African–American man had been in the bar and were drinking Corona beer. They were conspicuous because the overwhelming percentage of the bar's pa-

trons were Hispanic, and, on the night of the murder, the bar had only about fifty customers in it. Appellant and the African–American man played pool intermittently for almost two hours, beginning around ten or eleven at night. Appellant came up to Ibarra's bar asking for change, and he and the other man went in and out of the bar several times. Ibarra testified that she got a "good look" at appellant. Around 1:00 a.m., a fight broke out, and Ibarra went into Rios's office to get him, but he was not there. Approximately five minutes later, she heard a sound "like when somebody steps [on a can]," and went to the front of the bar, where she saw Rios "laid out," bleeding, and trying to speak. Ibarra held him and told him to be quiet. Although he continued to speak, she could not understand him. Ibarra called 911.

At the hospital, Ibarra spoke with police officers and told them that the shooter had a big tattoo on his left arm, a large tattoo on his neck, light colored eyes, an earring, and a small mustache.[2] Over objection from defense counsel, she identified appellant in the photo array that Detective Miller presented to her. She then identified appellant in the courtroom.

The State next called Urbina. Urbina testified that she was working in the taco stand on the night of the murder. She testified that Rios had recently installed a security camera in the taco stand that did not record, but that allowed him to observe the taco stand from his office. Rios instructed Urbina that if there was a problem she should put a jar in front of the camera so that he would be alerted and could come assist her.

---

**2.** On cross-examination, she testified that she also provided other identifying characteristics of appellant, such as a cleft chin and a point- ed nose, that differed slightly from appellant's actual physical appearance.

On the night of the murder, Urbina saw appellant and an African–American man enter and exit the bar several times. She testified that she had not seen them at the bar the night before, but that she had seen the African–American man at the bar two nights before the murder. The area outside of the bar was well lit, and she testified that she could see them clearly as they entered and exited. She witnessed appellant rob a man, and then she watched as he robbed another man who had come to help the first victim. She testified that appellant robbed them both at gunpoint. The African–American man did not have a weapon.

As appellant robbed the two men, Urbina moved her jar to indicate to Rios that something was wrong, and she then attempted to call Rios. While she was on the phone trying to reach Rios, the African–American man who had been with appellant entered the taco stand, demanded money, and then took approximately $140 from the till. She never saw him with a weapon. She saw appellant shoot the gun, attempt to enter the taco stand, be restrained by the African–American man, and then flee in a dark colored car with four doors. She found Rios lying in blood between a row of cars and his bar.

Urbina described the shooter to the police as approximately six feet four inches tall, between 150 and 160 pounds in weight, 25–30 years old, and having a shaved head, a small amount of light colored hair, a small moustache, a light beard and a tattoo on the back of his neck that looked like wings. She identified appellant in the second photo array that Detective Miller presented to her, and she identified appellant in court.

The State then called Leroy Rios. Rios testified that he first met Ibarra and Urbina on the night of the murder and that Detective Miller later asked him to translate for him when he presented the photo array to Ibarra and Urbina. He testified that he and Rios's widow followed Detective Miller to Urbina's house, where he translated as Detective Miller showed Urbina the photo array. After Urbina identified appellant in the photo array, Detective Miller, followed by Leroy Rios and the complainant's widow, went to Ibarra's house. Rios's wife was present when Urbina and Ibarra viewed the photo array. Leroy Rios testified that Urbina and Ibarra both identified appellant.

The State then called Detective Miller. He testified that, on June 12, 2007, he showed a photo array to Urbina that contained a picture of the first suspect in the case. Urbina could not identify anyone in the photo array. The day after a Crime Stoppers reward was publicized, the police received a tip that the shooter lived at 2530 Copper Valley, but the tip included no additional information. The following day, he and his partner went to that address and encountered Carolee Proctor. Detective Miller testified over appellant's hearsay objections to statements made to his partner and him by Carolee Proctor. Following that interview, he had a new photo array made that included a photograph of appellant, and he asked Leroy Rios to help him locate Urbina and Ibarra and to accompany him to translate as they viewed the new photo array. Detective Miller identified appellant in court, but testified that appellant had gained between 50 and 60 pounds since his arrest.

Detective Miller also testified that he requested appellant's cell phone records from AT & T on September 5, 2007. The records showed that appellant's phone was used in Houston on the day of the murder, but that no calls were made or received from approximately 9:30 p.m. on the night of the murder until approximately 9:30 a.m. on the morning after the murder.

The records also showed that appellant's phone was used in Louisiana on June 12, 2007.

Joseph Adams, who was incarcerated in the Harris County jail awaiting trial, testified that he approached appellant in jail because he recognized him from the Acres Homes subdivision in Houston. He testified that this is a predominantly African-American section of Houston, but that appellant was seen there frequently and was referred to as "White Mike." He testified that he saw appellant "in the streets, [and at] dog fights." Appellant told him that he had been arrested for a "BS capital murder." Appellant indicated that he had been charged with capital murder because, while he was in a bar, he began to argue with a woman; he and his friend were escorted from the club; and he went to get his pistol and "took care of business." Adams then testified that while he was in jail he heard appellant on the phone and heard him tell the other person, "Just tell your uncle I left the phone in the truck." He also testified that appellant sought to get tattoos while in jail to alter his appearance. Defense counsel did not cross-examine Adams.

The State then called Dr. Albert Chu, an assistant medical examiner for Harris County, who testified that a gunshot to the head killed Rios. The defense did not cross-examine Dr. Chu.

As its first witness, the defense called Dr. Frank Barnes, an orthopedic surgeon. Dr. Barnes testified that appellant had surgery on his ankle on April 23, 2007 and that it would have been unlikely, but possible, that appellant could have run six weeks after the surgery without pain or a limp.

The defense then called Carolee Proctor. She testified that on the night of the murder, around 10:00 p.m., she, appellant, and Salvador Hernandez were in a pizza restaurant. On cross-examination she admitted that her previous statement in an affidavit indicating that appellant was in Louisiana on the night of the murder was not truthful. The defense also called Hernandez, a friend of appellant's, who testified that appellant and Carolee Proctor were with him at the pizza restaurant on the night of the murder.

The defense then called Ernesto Rojas, a licensed computer forensic investigator. Rojas testified that on June 10, 2007 appellant's phone was used around his apartment in Houston, but the last call was at 9:47 p.m. on the night of the murder. Nothing in the cell phone records indicated that the phone was used in or near Louisiana on the night of the murder.

Finally, the defense called Labertha Dunbar, appellant's mother-in-law. She testified that appellant had gained weight since his wedding on May 19, 2007, but that otherwise his appearance had not changed significantly since the wedding. She testified that appellant was in Houston on the night of the murder.

The jury was instructed on the law of parties and convicted appellant of capital murder. The trial court sentenced him to life in prison without parole.

Appellant filed a motion for new trial on January 16, 2009, claiming that a juror took notes and that the notes were considered during deliberations. The trial court did not rule on appellant's motion for new trial, and it was overruled by operation of law.

## CRIME STOPPERS' PRIVILEGE

In his fourth issue, appellant contends the trial court erred in holding that the "crime stoppers" privilege applied to prevent disclosure of the documents related to the identity of the informant who provided the police with appellant's address and in

failing to conduct an *in camera* review of the information provided.

Appellant filed two motions and a subpoena duces tecum requesting the disclosure of all information obtained by the police from the crime stopper's tip, arguing that this tip might contain exculpatory information. Specifically, appellant asked for the trial court "to require the state to provide the defendant with any information regarding the defendant obtained by the police through the 'Crime Stoppers' Program. . . ." On August 18, 2008, he filed a second motion in which he asked the court "to instruct the prosecution and Crime Stoppers organizations to reveal the true name and present addressees of all informers and all reports of communications regarding the homicide of Mr. Resendo Rios on the 11th day of June 2008. . . ." Appellant also attached a subpoena duces tecum for Schepps demanding all information related to the payment of money for a crime stoppers tip. Schepps and the State both filed motions to quash appellant's motions for disclosure and his subpoena duces tecum.

The trial court held a hearing on the motions to quash. After determining that Schepps was a crime stoppers organization, the trial court granted the State's and Schepps' motion to quash appellant's request for disclosure of the identity of the informant. Appellant then asked for an oral amendment to his motion for disclosure so that the trial court could review the documents *in camera* to determine whether the material was potentially exculpatory. The court granted appellant's request to amend his motion, and then held a hearing on the record. At the hearing, defense counsel argued for *in camera* review of the evidence to determine if it was exculpatory on the ground that he believed the tip was provided by "the individual who was involved in the actual homicide or

somebody who's just being vengeful about [appellant] because of some issues between them. . . ." The trial court denied the motion to quash without conducting an *in camera* review of the crime stoppers records.

## 1. *Applicability of Crime Stoppers Privilege*

Appellant first argues in his fourth issue that Schepps' rewards program is not a crime stopper's organization, as required for the crime stoppers privilege to apply.

■ Evidence of a communication between a person submitting a tip to a crime stoppers organization is not admissible in a court proceeding except as provided by statute. *See* TEX. GOV'T CODE ANN. § 414.008(a) (Vernon 2005). In relevant part, Section 414.008 of the Government Code provides:

(a) except as otherwise provided by this section, evidence of a communication between a person submitting a report of a criminal act to the council or a crime stoppers organization and the person who accepted the report on behalf of the council or organization is not admissible in a court or an administrative proceeding.

(b) records of the council or a crime stoppers organization concerning a report of criminal activity may not be compelled to be produced before a court or other tribunal except on a motion:

(1) filed in a criminal trial court by a defendant who alleges that the records or report contains evidence that is exculpatory to the defendant in the trial of that offense;

. . . .

(c) on motion of a movant under Subsection (b), the court may subpoena the records or report. The court shall conduct an in camera inspection of materi-

als produced under subpoena to determine whether the materials contain:

(1) evidence that is exculpatory to the defendant. . . .

*Id.* § 414.008(a)-(c)(1).

Section 414.001(2) of the Government Code defines a "crime stoppers organization" as:

(A) a private, nonprofit organization that is operated on a local or statewide level, that accepts and expends donations for rewards to persons who report to the organization information about criminal activity and that forwards the information to the appropriate law enforcement agency; or

(B) a public organization that is operated on a local or statewide level, that pays rewards to persons who report to the organization information about criminal activity, and that forwards the information to the appropriate law enforcement agency.

*Id.* § 414.001(2)(A)-(B). The statute does not define "public organization."

Schepps is a wholly owned subsidiary of Dean Foods, a publically owned corporation. Ed Spencer, the administrator of Schepps' crime stoppers rewards program, testified at the hearing on the State's and Schepps' motions to quash the subpoena of Schepps' crime stoppers records. Spencer testified that Schepps started its rewards program as a component of its philanthropic endeavors to help provide justice and relief to the victims of certain violent crimes after one of its milkmen was killed in the early 1970's. After Schepps was acquired by Dean Foods, the program was extended to other dairies and other states, but it continues to operate through Schepps in Houston, Dallas, and Fort Worth, Texas. The program provides money to persons who supply law enforce-

ment officials with information concerning selected crimes.

Spencer testified that the Schepps crime stoppers organization is independent of the Harris County Crime Stoppers program but that the two often coordinate efforts. Sometimes Schepps decides to post an award and contacts local law enforcement agencies; sometimes, as here, it is contacted by a law enforcement agency and asked to post a reward for information leading to an arrest. Schepps does not operate a tip line of its own; rather, its reward announcements instruct persons offering tips to contact the law enforcement agency with which it is coordinating its efforts. Schepps generally offers a $10,000 reward, but when, as here, two persons are involved in a crime, it offers $5,000 for information leading to each arrest. The rewards program is financed by the individual dairies, and the money for it comes out of the dairies' operating budgets.

■ We conclude that, although Schepps is a for-profit organization and a subsidiary of a public corporation, its rewards program is a private non-profit organization that accepts funds contributed from Schepps' income and expends donations for rewards to persons who report to the appropriate law enforcement agency. We thus conclude that the crime stoppers rewards program in which Schepps participates qualifies as a crime stoppers organization within the scope of section 414.001(2)(A) of the Government Code. *See id.* § 414.001(2)(A) (providing definition for "crime stoppers organization"); *In re Hinterlong,* 109 S.W.3d 611, 622–23 (Tex.App.-Fort Worth 2003, no pet.) (holding that trial court did not abuse its discretion in holding that program at public high school which encouraged students to report crime and was affiliated with Tarrant County Crime Stoppers was "crime stoppers or-

ganization"). Therefore, we hold that the trial court did not abuse its discretion in holding that the crime stoppers privilege applied to the records and reports concerning the informant in this case.

We overrule the first part of appellant's fourth issue.

### 2. Denial of Request for In camera Inspection

Appellant also argues in his fourth issue that the trial court erred in failing to conduct an *in camera* review of the records and reports related to the tip as to appellant's address given by the informant in response to Schepps' reward offer.

The prosecution has an affirmative duty to disclose all material evidence favorable to the defense. *McFarland v. State,* 928 S.W.2d 482, 511 (Tex.Crim.App. 1996). Under the *"Brady* rule," the prosecution of a defendant violates due process when the State suppresses evidence in its possession that is favorable to an accused "[w]here the evidence is material either to guilt or to punishment irrespective of the good faith or bad faith of the prosecution." *Wyatt v. State,* 23 S.W.3d 18, 27 (Tex. Crim.App.2000) (citing *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215). *"Brady* has been extended to include the required revelation to an accused of material exculpatory evidence in the possession of police agencies and other parts of the 'prosecutorial team.'" *Ex parte Mitchell,* 977 S.W.2d 575, 578 (Tex.Crim.App.1997) (citing *Kyles v. Whitley,* 514 U.S. 419, 437, 115 S.Ct. 1555, 1567, 131 L.Ed.2d 490 (1995)). "Evidence withheld by a prosecutor is 'material' if there is 'a reasonable probability that, had the evidence been disclosed to the defense, the outcome of the proceeding would have been different.'" *Wyatt,* 23 S.W.3d at 27 (quoting *United States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d

481 (1985)). Thus, a due process violation occurs "if a prosecutor: (1) fails to disclose evidence, (2) favorable to the accused, (3) which creates a probability of a different outcome." *Id.* (citing *Thomas v. State,* 841 S.W.2d 399, 404 (Tex.Crim.App.1992)).

The crime stoppers privilege statute provides that a trial court may subpoena the records of a crime stoppers organization concerning a report of criminal activity on the motion of a defendant who alleges that the records or report contain evidence exculpatory to him, and, if it does so, it must conduct an *in camera* inspection of the records subpoenaed. Tex. Gov't Code Ann. § 414.008(b)-(c). However, the trial court is not required to subpoena the records merely at the defendant's request. *See* Tex. Gov't Code Ann. § 311.016(1) (providing that term "may" "creates discretionary authority or grants permission or power"). Rather, the defendant must make a plausible showing to the trial court, through sworn evidence or agreed facts, that the crime stoppers records in the possession of the State would be material exculpatory evidence that would create a probability of a different outcome. *See Wyatt,* 23 S.W.3d at 27; *Mitchell,* 977 S.W.2d at 578. If such a showing is made and the trial court, in the exercise of its discretion, subpoenas the crime stoppers records, it must then conduct an *in camera* inspection of the subpoenaed documents to determine if the produced information contains *Brady* evidence. An *in camera* inspection satisfies both the defendant's interest in the production of crime stoppers information that may be exculpatory and the State's interest in fostering law enforcement by protecting the identity of the crime stoppers informants. *Thomas v. State,* 837 S.W.2d 106, 113–14 (Tex.Crim.App.1992).

Here, appellant made no showing to the trial court that the crime stoppers report would be either exculpatory or material or that it would create the probability of a different outcome under the circumstances of this case and would therefore have served appellant's due process interest in the production of exculpatory information. *See Mitchell,* 977 S.W.2d at 578. The subpoena of the crime stoppers report under these circumstances could only have undermined the State's compelling interest in furthering law enforcement by intimidating informants from coming forward with information as to where an accused could be found. *See Thomas,* 837 S.W.2d at 114 (holding that allowing unrestricted access to crime stoppers information could compromise State's efforts to protect identity of crime stoppers informants). We hold that the trial court was not required to subpoena the crime stoppers records in this case, and thus it did not abuse its discretion in not conducting an *in camera* review of the information in the crime stoppers tip.[3]

We overrule appellant's fourth issue.

The discussion of the remaining points of error does not meet the criteria for publication, TEX.R.APP. P. 47, and is thus ordered not published.

We affirm the judgment of the trial court.

---

3. Appellant also contends that the trial court erred in not ruling on his motion, but in its ruling the trial court specifically stated, "I am denying your request for the information."