ACCEPTED
01-15-00628-Cr
FIRST COURT OF APPEALS
HOUSTON, TEXAS
12/15/2015 2:38:13 PM
CHRISTOPHER PRINE
CLERK

No. 01-15-00628-CR

In the

**Court of Appeals**

For the

**First District of Texas**

At Houston

———————◆———————

No. 1330029

In the 183rd District Court

Of Harris County, Texas

———————◆———————

**DARRELL D. BROUSSARD**

*Appellant*

V.

**THE STATE OF TEXAS**

*Appellee*

———————◆———————

STATE'S APPELLATE BRIEF

———————◆———————

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS

12/15/2015 2:38:13 PM

CHRISTOPHER A. PRINE
Clerk

DEVON ANDERSON
District Attorney
Harris County, Texas

KATIE DAVIS
Assistant District Attorney
Harris County, Texas
State Bar Number: 24070242
davis_katie@dao.hctx.net

ALYCIA HARVEY
Assistant District Attorney
Harris County, Texas

1201 Franklin Street, Suite 600
Houston, Texas 77002
Telephone: (713) 755-5826
Fax Number: (713) 755-5809

ORAL ARGUMENT WAIVED

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to TEX. R. APP. P. 9.4(g) and TEX. R. APP. P. 39.1, the State waives oral argument since the issues appear well-settled in Texas jurisprudence. But the State will present argument if this Court deems it necessary.

## IDENTIFICATION OF THE PARTIES

*Counsel for the State:*

**Devon Anderson**—District Attorney of Harris County

**Katie Davis**—Assistant District Attorney on appeal

**Alycia Harvey**—Assistant District Attorney at trial

*Appellant or Criminal Defendant:*

**Darrell D. Broussard**

*Counsel for Appellant:*

**Allen Tanner**—Counsel at trial

**Thomas J. Lewis**—Counsel on appeal

*Trial Judge:*

**Honorable Reagan Clark**—Visiting Judge of 183rd District Court

# TABLE OF CONTENTS

Page

STATEMENT REGARDING ORAL ARGUMENT ..................................................... i

IDENTIFICATION OF THE PARTIES ..................................................................... i

TABLE OF CONTENTS ............................................................................................. ii

INDEX OF AUTHORITIES ..................................................................................... iv

STATEMENT OF THE CASE .................................................................................... 1

STATEMENT OF FACTS ........................................................................................... 1

SUMMARY OF THE ARGUMENT ......................................................................... 4

REPLY TO APPELLANT'S FIRST POINT OF ERROR ....................................... 5

I.    Standard of Review and Applicable Law ...................................................... 7

II.   The appellant failed to preserve his complaint regarding Trelles' in-court identification for appellate review ................................................... 8

III.  Even if the issue was preserved, the appellant failed to show that the in-court identification was so tainted by an impermissibly suggestive pretrial identification that it should have been excluded .................................. 9

IV.   The appellant failed to show that the alleged suggestive procedure gave rise to a substantial likelihood of irreparable misidentification ............................ 12

REPLY TO APPELLANT'S SECOND POINT OF ERROR ............................... 14

I.    The jury was properly instructed that it must unanimously agree that the appellant unlawfully committed a murder while in the course of committing or attempting to commit a robbery. ...................................... 16

II.   The appellant was not harmed by any unanimity error in the jury charge. 19

REPLY TO APPELLANT'S THIRD POINT OF ERROR ................................... 21

I.    Standard of Review and Applicable Law ................................................... 21

II.  The evidence is legally sufficient to support the appellant's conviction for capital murder.........................................................................................23

REPLY TO APPELLANT'S FOURTH POINT OF ERROR.........................................32

I.  Standard of Review and Applicable Law....................................................37

II.  The excluded expert testimony was not sufficiently tied to the facts to be helpful to the jury.........................................................................................38

III.  The appellant failed to show he was harmed by the limited exclusion of Terrell's testimony. .....................................................................................41

CONCLUSION ............................................................................................................44

CERTIFICATE OF SERVICE AND COMPLIANCE.......................................................45

# INDEX OF AUTHORITIES

## CASES

*Adames v. State,*
  353 S.W.3d 854 (Tex. Crim. App. 2011) ........................................................ 21

*Aguilar v. State,*
  468 S.W.2d 75 (Tex. Crim. App. 1971) ........................................................ 31

*Almanza v. State,*
  686 S.W.2d 157 (Tex. Crim. App. 1985) ........................................................ 19

*Apolinar v. State,*
  155 S.W.3d 184 (Tex. Crim. App. 2005) ........................................................ 37

*Baldree v. State,*
  248 S.W.3d 224 (Tex. App.—
  Houston [1st Dist.] 2007, pet. ref'd) ........................................................ 38

*Ballah v. State,*
  14-10-00460-CR, 2012 WL 19653 (Tex. App.—
  Houston [14th Dist.] Jan. 5, 2012, pet. ref'd) ........................................ 9, 10, 11

*Barley v. State,*
  906 S.W.2d 27 (Tex. Crim. App. 1995) ........................................... 11, 12, 14

*Bradley v. State,*
  359 S.W.3d 912 (Tex. App.—
  Houston [14th Dist.] 2012, pet. ref'd) ........................................................ 31

*Broussard v. State,*
  434 S.W.3d 828 (Tex. App.—
  Houston [14th Dist.] 2014, pet. ref'd) ........................................................ 42

*Brown v. State,*
  29 S.W.3d 251 (Tex. App.—
  Houston [14th Dist.] 2000, no pet.) ........................................................ 8, 9

*Cardenas v. State,*
  30 S.W.3d 384 (Tex. Crim. App. 2000) ........................................................ 23

*Chapman v. State,*
  150 S.W.3d 809 (Tex. App.—
  Houston [14th Dist.] 2004, pet ref'd) ........................................................ 42

*Clayton v. State*,
235 S.W.3d 772 (Tex. Crim. App. 2007) .................................................................. 22, 31

*Cook v. State*,
884 S.W.2d 485 (Tex. Crim. App. 1994) ....................................................................24

*Davis v. State*,
313 S.W.3d 317 (Tex. Crim. App. 2010) ...............................................................17, 18

*Delk v. State*,
855 S.W.2d 700 (Tex. Crim. App. 1993) ..................................................................... 8

*Denman v. State*,
193 S.W.3d 129 (Tex. App.—
Houston [1st Dist.] 2006, pet. ref'd) ....................................................................... 19

*Ervin v. State*,
333 S.W.3d 187 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd) ................... 26, 27

*Ervin v. State*,
991 S.W.2d 804 (Tex. Crim. App. 1999) ...................................................................18

*Fuentes v. State*,
991 S.W.2d 267 (Tex. Crim. App. 1999) ...................................................................31

*Gamboa v. State*,
296 S.W.3d 574 (Tex. Crim. App. 2009) ..........................................................16, 17, 18

*Gardner v. State*,
306 S.W.3d 274 (Tex. Crim. App. 2009) ...............................................................16, 18

*Geesa v. State*,
820 S.W.2d 154 (Tex. Crim. App.1991) ....................................................................23

*Gonzales v. State*,
01-00-00916-CR, 2001 WL 1474848 (Tex. App.—
Houston [1st Dist.] Nov. 21, 2001, no pet.) ............................................................. 12

*Gonzalez v. State*,
337 S.W.3d 473 (Tex. App.—
Houston [1st Dist.] 2011, pet. ref'd) .......................................................................23

*Guilbeau v. State*,
193 S.W.3d 156 (Tex. App.—
Houston [1st Dist.] 2006, pet. ref'd) ....................................................................... 19

*Harmon v. State,*
167 S.W.3d 610 (Tex. App.—
Houston [14th Dist.] 2005, pet. ref'd) ...................................................31

*Henderson v. State,*
825 S.W.2d 746 (Tex. App.—
Houston [14th Dist.] 1992, pet. ref'd) ..................................................24

*Hernandez v. State,*
171 S.W.3d 347 (Tex. App.—
Houston [14th Dist.] 2005, pet. ref'd) ............................................ 26, 30

*Hooper v. State,*
214 S.W.3d 9 (Tex. Crim. App. 2007).................................................22

*Huffman v. State,*
267 S.W.3d 902 (Tex. Crim. App. 2008) .............................................18

*Jackson v. Virginia,*
443 U.S. 307 (1979)................................................................... 21, 32

*Johnson v. State,*
871 S.W.2d 183 (Tex. Crim. App. 1993)..............................................22

*Jones v. State,*
944 S.W.2d 642 (Tex. Crim. App. 1996).........................................24, 25

*Jordan v. State,*
928 S.W.2d 550 (Tex. Crim. App. 1996)..............................................38

*Kelly v. State,*
824 S.W.2d 568 (Tex. Crim. App. 1992)..............................................37

*Kitchens v. State,*
823 S.W.2d 256 (Tex. Crim. App. 1991) ............................................. 16

*Laster v. State,*
275 S.W.3d 512 (Tex. Crim. App. 2009) ..............................................23

*Leza v. State,*
351 S.W.3d 344 (Tex. Crim. App. 2011) ..............................................26

*Lopez v. State,*
884 S.W.2d 918 (Tex. App.—
Austin 1994, pet. ref'd) ....................................................................22

*Losada v. State,*
721 S.W.2d 305 (Tex. Crim. App. 1986) ..............................................31

*Loserth v. State,*
963 S.W.2d 770 (Tex. Crim. App. 1998) ................................................. 8

*Manrique v. State,*
994 S.W.2d 640 (Tex. Crim. App. 1999) ...............................................25

*Martinez v. State,*
129 S.W.3d 101 (Tex. Crim. App. 2004) ............................................... 16

*Mayes v. State,*
816 S.W.2d 79 (Tex. Crim. App. 1991) ..................................................42

*Montgomery v. State,*
383 SW3d 722 (Tex. App.—
Houston [14th Dist.] 2012, no pet.) .....................................................43

*Montgomery v. State,*
810 S.W.2d 372 (Tex. Crim. App. 1990) ........................................ 37, 40

*Morales v. State,*
32 S.W.3d 862 (Tex. Crim. App. 2000) .......................................... 37, 38

*Motilla v. State,*
78 S.W.3d 352 (Tex. Crim. App. 2002) ................................................. 41

*Mouton v. State,*
923 S.W.2d 219 (Tex. App.—
Houston [14th Dist.] 1996, no pet.) .....................................................24

*Ngo v. State,*
175 S.W.3d 738 (Tex. Crim. App. 2005) ............................................... 16

*Page v. State,*
125 S.W.3d 640 (Tex. App.—
Houston [1st Dist.] 2003, pet. ref'd) ................................................11, 12

*Paulson v. State,*
28 S.W.3d 570 (Tex. Crim. App. 2000) .................................................23

*Perry v. State,*
703 S.W.2d 668 (Tex. Crim. App. 1986) .................................................9

*Potier v. State,*
68 S.W.3d 657 (Tex. Crim. App. 2002) ................................................. 41

*Powell v. State,*
194 S.W.3d 503 (Tex. Crim. App. 2006) ...............................................32

*Proctor v. State,*
   319 S.W.3d 175 (Tex. App.—
   Houston [1st Dist.] 2010, pet. struck) ..................................................... 14

*Ray v. State,*
   178 S.W.3d 833 (Tex. Crim. App. 2005) .................................................. 41

*Reed v. State,*
   158 S.W.3d 44 (Tex. App.—
   Houston [14th Dist.] 2005, pet. ref'd) ...................................................... 22

*Rousseau v. State,*
   855 S.W.2d 666 (Tex. Crim. App. 1993) ............................................. 39, 41

*Santos v. State,*
   116 S.W.3d 447 (Tex. App.—
   Houston [14th Dist.] 2003, pet. ref'd) ...................................................... 8, 9

*Seals v. State,*
   01-06-00061-CR, 2007 WL 1633776 (Tex. App.—
   Houston [1st Dist.] June 7, 2007, no pet.) ............................................... 14

*Shepherd v. State,*
   273 S.W.3d 681 (Tex. Crim. App. 2008) .................................................. 37

*Sholars v. State,*
   312 S.W.3d 694 (Tex. App.—
   Houston [1st Dist.] 2009, pet. ref'd) ......................................................... 26

*Temple v. State,*
   390 S.W.3d 341 (Tex. Crim. App. 2013) .................................................. 22

*Tillman v. State,*
   354 S.W.3d 425 (Tex. Crim. App. 2011) .............................................. 37, 38

*Tillman v. State,*
   376 S.W.3d 188 (Tex. App.—
   Houston [14th Dist.] 2012, no pet.) .......................................................... 43

*Tillman v. State,*
   426 S.W.3d 836 (Tex. App.—
   Houston [1st Dist.] 2014, pet. ref'd) ......................................................... 24

*Valtierra v. State,*
   310 S.W.3d 442 (Tex. Crim. App. 2010) .................................................. 37

*Wallace v. State*,
   75 S.W.3d 576 (Tex. App.—
   Texarkana 2002),
   *aff'd*, 106 S.W.3d 103 (Tex. Crim. App. 2003)..........................................8, 9

*Walters v. State*,
   247 S.W.3d 204 (Tex. Crim. App. 2007) ..................................................... 41

*Weatherred v. State*,
   15 S.W.3d 540 (Tex. Crim. App. 2000) ........................................................37

*Wyatt v. State*,
   23 S.W.3d 18 (Tex. Crim. App. 2000)...........................................................31

*Wygal v. State*,
   555 S.W.2d 465 (Tex. Crim. App. 1977) ......................................................27

## STATUTES

TEX. CODE CRIM. PROC. ANN.
   art. 36.19 (West 2006) ...................................................................................... 19

TEX. PENAL CODE § 1.07 (West supp. 2014) ....................................................24

TEX. PENAL CODE § 6.03(a) (West 2011)...........................................................24

TEX. PENAL CODE § 7.01(a) (West 2011) ...........................................................26

TEX. PENAL CODE § 7.02(a)(2) (West 2011) .......................................................26

TEX. PENAL CODE § 7.02(b) (West 2011) ...........................................................26

TEX. PENAL CODE § 19.03(a)(2) (West supp. 2014) ..........................................23

TEX. PENAL CODE § 29.02(a) (West 2011) .........................................................23

## RULES

TEX. R. APP. P. 9.4(g) ..............................................................................................i

TEX. R. APP. P. 33.1.................................................................................................9

TEX. R. APP. P. 39.1..................................................................................................i

TEX. R. APP. P. 44.2(b).......................................................................................... 41

TEX. R. EVID. 103 .................................................................................................. 41

Tex. R. Evid. 104(a) ............................................................... 37

Tex. R. Evid. 403............................................................... 38, 39

Tex. R. Evid. 702 ............................................................... 37

TO THE HONORABLE COURT OF APPEALS:

## STATEMENT OF THE CASE

The State charged the appellant with capital murder by causing the death of Ahmad Adnan Issaoui while in the course of committing or attempting to commit a robbery, and the jury found the appellant guilty (CR – 295; 6 RR 34-35). The trial court sentenced him in accordance with the jury's verdict to life without the possibility of parole in the Texas Department of Criminal Justice, Institutional Division (CR – 298-99; 6 RR 36-37). The appellant gave timely notice of appeal, and the trial court certified that he had the right to appeal (CR – 301-2; 6 RR 38).

## STATEMENT OF FACTS

During the early morning hours of November 28, 2011, a game room located at Jim's Tire Shop was robbed at gunpoint. Luis Trelles (also known as "Tiny") worked in the game room as the attendant (4 RR 65-66). When people would enter the game room, Trelles would have them sign in, assign them a machine, and give them a "match" for their money (4 RR 66, 71-72). *See* (St. Ex. #46).

Ahmad Adnan Issaoui worked in the game room as the security officer (4 RR 66-67). As part of his job requirement, Issaoui carried a gun on him while he worked (4 RR 67-68). Issaoui did not have a gun of his own and borrowed Trelles' .40 caliber Smith & Wesson revolver during his shifts (4 RR 68).

That evening, Herb Singleton came in the game room with several friends (4 RR 69-70). Trelles knew Singleton and one of his friends, Edward Broussard, from around the neighborhood (4 RR 70-71). Singleton did not sign the log sheet, and Broussard signed in as "Chris" (4 RR 72-73). *See* (St. Ex. #46). While Singleton and his friends were playing the machines, Singleton lost his phone and Trelles tried to help him find it (4 RR 74). Without locating the phone, Singleton and his friends left the game room, and business slowed down for the evening (4 RR 76). Later, regular customers Martin and Kim McCoy came in, signed in, received a match, and began playing (4 RR 18-19, 41, 77). After a while, Singleton returned to the game room, this time alone, and started playing again (4 RR 20, 42-43, 77). Trelles noticed that Singleton had a new phone with him and was using it more than usual (4 RR 77-78).

While Singleton and the McCoys continued to play in the game room, Trelles went into his office (4 RR 78-82). Trelles heard a loud popping sound that sounded like a gunshot and heard Issaoui scream (4 RR 82-83). Trelles came out of his office to see what had happened and encountered the appellant who pointed a gun directly at him (4 RR 83-84). The appellant asked Trelles where the money was and told him not to move (4 RR 84). Trelles told the appellant that the money was in the office; the appellant took around $1,000 from Trelles' pocket and then shot him in the leg (4 RR 84-87). The appellant then searched the office for the

money and a second gunman held a gun to Trelles' chest (4 RR 90). Trelles noticed that both men carried Glocks (semiautomatic weapons) (4 RR 94-96). Trelles recognized the second gunman as Broussard, whom he had seen in the game room earlier that evening (4 RR 90). Broussard continued to demand that Trelles give him the rest of the money and Singleton intervened (4 RR 24, 46, 90-91). Singleton and Broussard got into an argument about what was going on (4 RR 90-91). At that point, Broussard and the appellant ran out of the game room (4 RR 91). Singleton gave Trelles his phone to call the police but then stated, "I got to go" and left the game room before the police arrived (4 RR 94). The McCoys helped Trelles with his gunshot wound and waited for the police (4 RR 25-27, 47-48). Martin McCoy went to check on Issaoui and saw he had been shot in the chest (4 RR 28).

Mario Quintanilla, a Harris County Sheriff's Homicide Investigator, responded to the scene (4 RR 174-79). Quintanilla observed that Issaoui was deceased upon his arrival, and Trelles had been taken to the hospital for a gunshot wound (4 RR 179-80). Quintanilla noticed that it appeared someone forcefully removed Issaoui's gun from his gun belt based on the location of the gun belt on his body (4 RR 185). *See* (St. Ex. #18). He received information from the responding deputies, collected evidence and spoke to witnesses (4 RR 180-81). Based on surveillance footage, Quintanilla determined that more than the two gunmen were involved in the robbery (4 RR 191-199). He saw another suspect exit

3

Singleton's car in the parking lot and get into the getaway vehicle; he then saw Singleton leave before police arrived (4 RR 197-99).

After speaking with witnesses, including Trelles and Singleton, and receiving a tip, Quintanilla developed Broussard and the appellant as suspects (4 RR 206-14). Trelles positively identified Broussard and the appellant as the gunmen (4 RR 143, 223). *See* (Ex. 72, 102).

Dr. Darshan Phatak, a Harris County Assistant Medical Examiner, performed an autopsy on Issaoui (5 RR 65-66). Phatak observed that Issaoui had been shot four separate times at close range: twice in the head and twice in the abdomen (5 RR 74-77). He determined that Issaoui died from his gunshot wounds and that the manner of his death was homicide (5 RR 70-71).

## SUMMARY OF THE ARGUMENT

The appellant's failure to object to the in-court identification waived any possible error. Regardless, the appellant failed to show that the in-court identification was so tainted by an impermissibly suggestive pretrial identification that it should have been excluded.

The appellant was not denied a unanimous verdict because the jury was properly charged on alternate methods of committing the same capital murder when the same victim was alleged for the predicate murder. Furthermore, the appellant failed to show harm.

The evidence admitted in this case was legally sufficient to enable a rational factfinder to find each element of the offense of capital murder, including that the appellant acted as a principal or a party, giving due deference to the jury's role as the factfinder and judge of the credibility of the evidence, and reviewing the record in the light most favorable to the guilty verdict.

The trial court did not abuse its discretion in excluding limited portions of the expert's testimony because the expert failed to sufficiently tie pertinent facts of the case to the principles that were the subject of his testimony so as to be helpful to the jury. Furthermore, the appellant failed to show harm.

## REPLY TO APPELLANT'S FIRST POINT OF ERROR

In the appellant's first point of error, he argues that the trial court erred by allowing Trelles to identify the appellant because the in-court identification was tainted by an impermissibly suggestive pretrial identification process (App'nt Brf. 9-13). On December 8, Trelles positively identified the appellant from a photo spread as the gunman who shot him in the leg and took money from his pockets and office (4 RR 142-43). *See* (St. Ex. #69, 102). The appellant filed a motion to suppress this identification, and a hearing was held outside the presence of the jury (CR – 267-70; 4 RR 59, 113-33).

The hearing revealed that through the course of his investigation, Quintanilla showed Trelles eight[1] different photo spreads containing different suspects who may have played a role in the robbery; however, Trelles did not identify a person out of every photo spread shown to him (4 RR 114-15). To create the photo spreads, Quintanilla placed five other males with similar characteristics and features and used a computer system to randomize the photos on the array (4 RR 116-17). *See* (St. Ex. #102).

Before showing him any photo spreads, Quintanilla testified that he gave Trelles written admonishments (4 RR 107-8). *See* (St. Ex. #62). These admonishments informed Trelles that he would be asked to look at a group of photographs and admonished him that: (1) the fact that the photographs were being shown to him should not influence his judgment; (2) he should not conclude or guess that it contain a picture of the person who committed the crime; (3) he was not obligated to identify anyone; (4) it was just as important to clear innocent people as to identify the perpetrator; and (5) he was not to tell anyone that he made an identification (4 RR 107-8, 117-18). *See* (St. Ex. #62). Quintanilla testified that Trelles understood those admonishments (4 RR 108, 117-18). *See* (St. Ex. #62). Trelles testified that was given the admonishments, and no evidence was

---

[1] The appellant only objected to the photo spreads that contained his photo and had no objection the other photo spreads admitted (4 RR 106-13, 134-44). *See* (St. Ex. # 49-50, 62-67, 70-72).

6

presented that he did not understand the admonishments (4 RR 106). *See* (St. Ex. #62).

When Quintanilla showed the appellant the photo spread containing the appellant he testified that he sat across from Trelles, that he did not look at the photographs at the same time as Trelles, and that did not give him any indication as to whom he should pick (4 RR 118, 121). Quintanilla testified that he did not indicate to Trelles in any way which photo was the target (4 RR 118-19). He stated that Trelles only looked at the photo spread for a second before he made the identification and stated, "[t]hat's the guy that shot me in the leg." (4 RR 122). Trelles testified that he was "pretty positive," "99.9%" sure that he identified the right person (4 RR 132-33).

The trial court denied the appellant's motion to suppress the pre-trial identification (4 RR 126-27). The trial court found that the photo spread compilation was properly done and that the photo spread procedure was not impermissibility suggestive such that a misidentification could have occurred (4 RR 126, 129, 133). During trial, Trelles identified the appellant in front of the jury as the person who shot him in the leg without objection (4 RR 143).

## I.     Standard of Review and Applicable Law

An in-court identification is inadmissible when it has been tainted by an impermissibly suggestive pretrial photo spread. *Brown v. State*, 29 S.W.3d 251, 254

7

(Tex. App.—Houston [14th Dist.] 2000, no pet.) (citing *Loserth v. State*, 963 S.W.2d 770, 773 (Tex. Crim. App. 1998)). The admissibility of an identification is a mixed question of law and fact that appellate courts reviews *de novo*. *Id*. A reviewing court employs a two-step analysis: (1) determining whether the pretrial procedure was impermissibly suggestive, and if so, (2) whether the suggestive pretrial procedure gave rise to a very substantial likelihood of irreparable misidentification. *Delk v. State*, 855 S.W.2d 700, 706 (Tex. Crim. App. 1993) (noting that the appellant has the burden to show that the in-court identification is unreliable by proving both these elements by clear and convincing evidence); *Santos v. State*, 116 S.W.3d 447, 451 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd). An analysis of these two steps requires a reviewing court to examine the totality of the circumstances surrounding the particular case. *Wallace v. State*, 75 S.W.3d 576, 584 (Tex. App.—Texarkana 2002), *aff'd*, 106 S.W.3d 103 (Tex. Crim. App. 2003).

II.     **The appellant failed to preserve his complaint regarding Trelles' in-court identification for appellate review.**

The appellant contends that the in-court identification was unduly tainted by the suggestive pretrial identification procedures. (App'nt Brf. 13). But the appellant failed to object to Trelles' in-court identification, instead objecting only to the pretrial photographic identification (4 RR 143). The failure of the appellant to complain or object in trial to the in-court identification waives any complaint

regarding the in-court identification on appeal. *Perry v. State*, 703 S.W.2d 668, 671 (Tex. Crim. App. 1986); *Ballah v. State*, 14-10-00460-CR, 2012 WL 19653, at *2 (Tex. App.—Houston [14th Dist.] Jan. 5, 2012, pet. ref'd) (mem. op., not designated for publication); *see also* TEX. R. APP. P. 33.1; *Wallace*, 75 S.W.3d at 584 ("An objection to the array does not preserve for appellate review any complaint regarding the in-court identification."). Thus, the appellant's first point of error should be overruled.

### III. Even if the issue was preserved, the appellant failed to show that the in-court identification was so tainted by an impermissibly suggestive pretrial identification that it should have been excluded.

The appellant argues that the content of the photo spread was impermissibly suggestive (App'nt Brf. 10-11). *See Santos*, 116 S.W.3d at 451 (noting that either the manner or the content of a pretrial identification procedure may render the identification impermissibly suggestive). A photo spread is considered impermissibly suggestive if the other lineup participants are greatly dissimilar in appearance from the suspect. *Brown*, 29 S.W.3d at 254. But minor discrepancies between participants will not render a photo spread impermissibly suggestive, and the participants need not be identical to satisfy the requirements of due process. *Id.*

Here, all six individuals in the photo spread containing the appellant were black males with similar characteristics and features; each had short black hair and some facial hair (4 RR 116). *See* (St. Ex. #69, 102). All six pictures were taken from the front against a plain background. *See* (St. Ex. #69, 102). It is not possible to determine the heights of the individuals from the photographs; thus, height does not distinguish the appellant. *See* (St. Ex. #69, 102). Nothing about the appellant's clothing differentiates him from the other participants; he is not wearing the attire Trelles described him in on the night of the offense. *See* (St. Ex. #69, 102). And nothing about the darkness of several photographs differentiates the appellant from the other men pictured. *See* (St. Ex. #69, 102).

Moreover, although the appellant does not appear to complain about the manner in which Quintanilla showed Trelles the photo spread on appeal, it was properly administered. As previously stated, Trelles read and signed an admonishment form, indicating that he understood the directions (4 RR 107-8, 117). *See* (St. Ex. #62). The testimony showed that Quintanilla did not indicate to Trelles that a suspect was included in the photo spread, nor did he suggest which individual to choose (4 RR 113-19). Furthermore, Trelles testified that he chose the appellant almost immediately (4 RR 157). Therefore, the photo spread was not impermissibly suggestive. *See Ballah*, 2012 WL 19653 at *3 (finding a photo spread was not impermissibly suggestive even though the appellant and another male

were wearing plain white T-shirts and all four other men are wearing different clothing, including one who is not wearing a shirt and even though some photographs were darker than others).

The appellant argues that the photo spread content was impermissibly suggestive because three participants had visibly darker complexions than the appellant. (App'nt Brf. 9-11). But this concern was cleared up with the admission of State's Exhibit 102 and by Quintanilla's testimony that the exhibit was a copy of the original (4 RR 123-25). *See* (St. Ex. #69, 102). Quintanilla explained that it was a copying issue and that the original photo spread, State's Exhibit 102, that he showed Trelles was "a whole lot lighter" (4 RR 124).

Even if some photographs were darker than others, the variations in the lighting of the photographs were minimal, with three photos only slightly darker. And "[s]light differences in the background color and brightness of photographs are insignificant." *Page v. State*, 125 S.W.3d 640, 647 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd); *Barley v. State*, 906 S.W.2d 27, 33-34 (Tex. Crim. App. 1995) (holding that photographic array containing two "older and faded" photographs and photograph "obviously taken in a different setting" not impermissibly suggestive). Nothing about the darkness of the photographs differentiates the appellant from the other men pictured. *See id.*; *Ballah*, 2012 WL 19653 at *4.

The appellant complains that his tattoos were visible on his neck and hands, and only one other subject had visible tattoos. (App'nt Brf. 11). But a photo spread is not "impermissibly suggestive merely because each photograph can be distinguished in some manner from the photograph of the accused." *Page*, 125 S.W.3d at 647. Additionally, he was not the only one shown with this distinctive feature; another individual had neck tattoos. *See* (St. Ex. #69, 102); *see also Gonzales v. State*, 01-00-00916-CR, 2001 WL 1474848, at *2 (Tex. App.—Houston [1st Dist.] Nov. 21, 2001, no pet.) (not designated for publication) (holding photo spread not impermissibly suggestive when only the appellant and one other individual had neck tattoos). Thus, the photo spread was not impermissibly suggestive.

IV.  **The appellant failed to show that the alleged suggestive procedure gave rise to a substantial likelihood of irreparable misidentification.**

Courts consider five different factors to determine the likelihood of irreparable misidentification: (1) the opportunity to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and confrontation. *Barley*, 906 S.W.2d at 34-35.

Here, Trelles had a good opportunity to view the appellant at the time of the robbery. He testified that the gunman who shot him wore nothing to cover his face

12

and that the encounter "felt like an eternity" (4 RR 84, 156-57). Although he later stated the encounter was more likely a few minutes, he was persistent that he was able to recognize the appellant immediately (4 RR 156-57). And it is clear from his testimony that Trelles' attention was focused on the appellant and then on Broussard after the appellant shot him.

Trelles' description of the appellant was accurate. He told police that the man who shot him was a black male with not particularly dark skin, about 6 foot 1 inch tall and weighed about 160 pounds (4 RR 152-53, 235-36). He also testified that he told the police that the gunman was wearing a hoodie (4 RR 101-3, 153-56). While there were some differences in his description and testimony, Trelles explained that he saw the person who shot him when he stood over him and "was sure of it" (4 RR 153-57). Trelles testified that he thought he had told police about the facial hair and tattoos (4 RR 153-57). And he clarified that the appellant's hoodie was down, which is how he saw his face and was able to identify him (4 RR 153-54).

Furthermore, Quintanilla testified that Trelles immediately identified the appellant after being shown the photo spread (4 RR 116-19, 222). Trelles testified that he immediately recognized the appellant in the photo spread as the gunman who shot him and he was 99.9% sure of his choice (4 RR 157). Also, Trelles had

viewed prior photo spreads that did not contain the appellant's photo and was unable to identify anyone in them as the shooter (4 RR 113-34).

Finally, although the trial did not occur until nearly four years after the crime, Trelles made his identification of the appellant on the photo spread a little over a week after the robbery (4 RR 113-26). *See Proctor v. State*, 319 S.W.3d 175, 185 (Tex. App.—Houston [1st Dist.] 2010, pet. struck) (noting a month between the murder and an identification on a photo spread did not give rise to a substantial likelihood of irreparable misidentification). Thus, the factors weigh in favor of the trial court's ruling to admit the identification evidence. *See Barley*, 906 S.W.2d at 33; *Seals v. State*, 01-06-00061-CR, 2007 WL 1633776, at *3 (Tex. App.—Houston [1st Dist.] June 7, 2007, no pet.) (mem. op., not designated for publication). Therefore, the appellant failed to show that, even if the photo spread was suggestive that it gave rise to a very substantial likelihood of irreparable misidentification. The appellant's first point of error should be overruled.

## REPLY TO APPELLANT'S SECOND POINT OF ERROR

In the appellant's second point of error, he argues that the trial court erred in allowing the jury to reach a non-unanimous verdict. (App'nt Brf. 8, 13-19). Specifically, the appellant complains about allowing the jury to find the appellant guilty of capital murder while committing or attempting to commit the robbery of either Trelles *or* Issaoui. The appellant argues that the robbery of Trelles was a

14

separate offense from the robbery and of Issaoui. (App'nt Brf. 19). But this argument lacks merit.

Prior to jury selection, the appellant objected to the State presenting two theories of capital murder to the jury and asked for the State to be required to choose between whether the murder occurred within the course of committing a robbery or attempting to commit a robbery of either Trelles *or* Issaoui (2 RR 3-4). The trial court overruled the objection (2 RR 4). During the charge conference, the appellant again objected stating:

> [W]e also object to the charge to the jury in the disjunctive based on an indictment that was actually pled in the conjunctive. The State should be required – we're asking the Court to require them at this time to elect between the two offenses in the charge, specifically that the defendant committed the aggravated robbery of Luis Trelles or the aggravated robbery of Ahmad Issaoui. Since these are two separate offenses with two separate victims, committed by separate suspects, this could result in a non-unanimous verdict by this jury where several jurors think he's guilty of one and several of the other and it's not unanimous as to one or the other. So, we are objecting to the Court charging in this form.

(4 RR 4). The State responded that, based on case law, there did not need to be an agreement as to who the victim of the underlying robbery was in order for the verdict to be unanimous (4 RR 4-5). The trial court overruled the appellant's objection (4 RR 5).

15

The trial court charged the jury that it should find the appellant guilty of capital murder, either on his own or as a party, as charged in the indictment, if it found from the evidence beyond a reasonable doubt that:

> [O]n or about the 28th day of November, 2011, in Harris County, Texas, the defendant, Darrell Dwayne Broussard, did then and there unlawfully, while in the course of committing or attempting to commit the robbery of Ahmad Adnan Issaoui or Luis Trelles, intentionally cause the death of Ahmad Adnan Issaoui by shooting Ahmad Adnan Issaoui with a deadly weapon, namely a firearm...

(CR – 287-90). The jurors were further instructed to certify their verdict only after they "have unanimously agreed upon a verdict," and they did reach a unanimous verdict (CR – 293-95).

## I. The jury was properly instructed that it must unanimously agree that the appellant unlawfully committed a murder while in the course of committing or attempting to commit a robbery.

A unanimous verdict is required in all felony cases. *Ngo v. State*, 175 S.W.3d 738, 745 (Tex. Crim. App. 2005). The unanimity requirement is not violated by instructing the jury on alternative theories of committing the same offense. *Kitchens v. State*, 823 S.W.2d 256, 258 (Tex. Crim. App. 1991); *Martinez v. State*, 129 S.W.3d 101, 103 (Tex. Crim. App. 2004). This applies equally to alternate underlying offenses for capital murder, "so long as the same victim is alleged for the predicate murder." *Gamboa v. State*, 296 S.W.3d 574, 584 (Tex. Crim. App. 2009); *Gardner v. State*, 306 S.W.3d 274, 302 (Tex. Crim. App. 2009) (noting that the gravamen of

capital murder is intentionally causing a death, plus any one of various different types of aggravating elements). "Nothing prohibits a single capital murder from containing alternate underlying offenses *that are the same statutory offense but with different victims or different underlying methods of commission*, so long as the same victim is alleged with respect to the predicate murder." *Davis v. State*, 313 S.W.3d 317, 342 (Tex. Crim. App. 2010) (emphasis added).

Here, the State charged the appellant with murder of one victim, Issaoui (CR – 22, 289). Because the appellant intentionally caused the death of Issaoui while in the course of committing or attempting to commit a robbery, the State properly charged the appellant with the capital murder of Issaoui (CR – 289-90). *Davis*, 313 S.W.3d at 343. Although the State alleged two different victims to the underlying robbery, the Court of Criminal Appeals explained in *Davis* that a jury need not agree on which underlying offense the defendant was in course of committing when he murdered a particular victim because each underlying offense is merely a different manner and means of committing the same capital murder (CR – 289-90). *Id.* (holding that appellant not denied a unanimous verdict when the jury was allowed to convict him of capital murder by burglary of a habitation based on theft of one victim or burglary of a habitation based on sexual assault of a second victim). Thus, the jury charge did not deny the appellant a right to a unanimous verdict. *See Gamboa*, 296 S.W.3d at 584 (holding that appellant not

17

denied a unanimous verdict when the jury was allowed to convict appellant of capital murder by committing a murder while in the course of committing a robbery or another murder).

The appellant attempts to distinguish *Gamboa*, arguing that the robbery of Issaoui was a separate transaction from the robbery of Trelles. (App'nt Brf. 17-18). But this argument lacks merit. A reviewing court does not look to the sufficiency of the evidence to determine what elements and facts a jury must unanimously agree on, but rather the gravamen of the offense in question. *See Davis*, 313 S.W.3d at 342; *Gamboa*, 296 S.W.3d at 583-84. And the gravamen of capital murder is intentionally causing the death of a person plus an aggravating element. *Gardner*, 306 S.W.3d at 302; *Gamboa*, 296 S.W.3d at 583-84. Courts have consistently held that, with respect to homicide offenses, that different legal theories involving the same victim are simply alternate methods of committing the same offense. *Davis*, 313 S.W.3d at 342; *Gamboa*, 296 S.W.3d at 583-84; *Huffman v. State*, 267 S.W.3d 902, 905-907 (Tex. Crim. App. 2008); *Ervin v. State*, 991 S.W.2d 804 (Tex. Crim. App. 1999). Thus, the jury was properly instructed. The appellant's second point of error should be overruled.

## II. The appellant was not harmed by any unanimity error in the jury charge.

The Court of Criminal Appeals set out the harm analysis for an error in the jury charge in *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985). The *Almanza* analysis does not apply, however, unless this Court first determines that there is any error in the jury charge. *Guilbeau v. State*, 193 S.W.3d 156, 161 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd). And as previously stated, the trial court did not violate appellant's right to a unanimous verdict by failing to order the State to elect a single victim to the underlying felony upon which to base its capital murder case.

Nevertheless, if this Court finds error in the charge, it must determine whether there was a proper objection to the charge and, if so, determine the harm by examining the "entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Id.* The degree of harm that must be present to require reversal of a case depends upon whether the error was preserved or unpreserved. *Denman v. State*, 193 S.W.3d 129, 134 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd); TEX. CODE CRIM. PROC. ANN. art. 36.19 (West 2006). Here, because there was a trial objection, reversal is required if the error is "calculated to injure the rights of the defendant," defined to mean that there is "some harm." *Almanza*, 686 S.W.2d at 171.

The remainder of the jury charge was correct. And the state of the evidence was in favor of a conviction. Trelles testified that the appellant was the one who shot him in the leg after demanding to know where the money was located (4 RR 101-3, 143, 223). He stated that he was "99.9%" sure when he identified the appellant, and his initial description to police closely described the appellant (4 RR 153-57). Quintanilla testified that Trelles identified the appellant in the photo spread immediately (4 RR 222-23). Additionally, Trelles and the McCoys testified that immediately after Issaoui was shot, the gunman pointed the gun towards Trelles and demanded money (4 RR 20-21, 44-45, 83-87). Trelles testified that the gunmen took money from the office and his pockets and that he feared for his life (4 RR 86-87). Quintanilla testified it appeared that the gun Issaoui was carrying that evening had been taken by force (4 RR 185). Moreover, the ballistics evidence confirmed that the gunmen used semiautomatic weapons, most likely Glocks (4 RR 95; 5 RR 19-34).

Furthermore, the appellant's defense was not predicated on isolating one robbery from another but rather on the lack of evidence to prove that he committed the crime at all. The appellant presented an expert to dispute Trelles' testimony as unreliable and presented Tanya Fisher to establish that someone else may have been responsible for the crime (5 RR 89-140, 145-62). The appellant argued that the only evidence linking him to the murder was Trelles'

identification, focusing on the lack of DNA and fingerprints (6 RR 14-15). Therefore, the appellant cannot show that he was harmed by any error in the jury charge, and his second point of error should be overruled.

**REPLY TO APPELLANT'S THIRD POINT OF ERROR**

In the appellant's third point of error, he argues that that the evidence presented in his case was legally insufficient to convince any rational factfinder beyond a reasonable doubt that he committed the offense of capital murder. (App'nt Brf. 19-25).

## I.       Standard of Review and Applicable Law

Every criminal conviction must be supported by legally sufficient evidence that each element of the offense is proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 315 (1979); *Adames v. State*, 353 S.W.3d 854, 853 (Tex. Crim. App. 2011). In order to determine whether this standard has been met, an appellate court reviews all the evidence in the light most favorable to the verdict and decides whether, based on that evidence and reasonable inferences, a rational factfinder could have found each essential element of the crime beyond a reasonable doubt. *Jackson*, 443 U.S. at 319 (finding that "the relevant question is whether, after viewing the evidence in light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.") (emphasis in original); *Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim.

21

App. 2013); *Reed v. State*, 158 S.W.3d 44, 46 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd). This applies equally to the analysis of direct or circumstantial evidence in the record. *Reed*, 158 S.W.3d at 47.

Circumstantial evidence alone can be sufficient to establish guilt, and is analyzed the same as direct evidence in the record. *Temple*, 390 S.W.3d at 359 ("A criminal conviction may be based upon circumstantial evidence."); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (noting "[c]ircumstantial evidence is as probative as direct evidence in establishing the guilt of an actor" and that "circumstantial evidence alone can be sufficient to establish guilt."); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (same). Not every fact has to point to the defendant's guilt, rather "it is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances." *Temple*, 390 S.W.3d at 359 (quoting *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993)); *see Clayton*, 235 S.W.3d at 778. When conflicts appear in the record a reviewing court must presume the trier of fact resolved the conflict in favor of the verdict and should defer to that resolution. *Id.* at 360.

The jury's role is to "weigh the evidence, to judge the credibility of the witnesses, and to choose between the conflicting theories of the case." *Lopez v. State*, 884 S.W.2d 918, 921 (Tex. App.—Austin 1994, pet. ref'd) (citing *Geesa v. State*,

820 S.W.2d 154, 159 (Tex. Crim. App.1991) (overruled in part on other grounds by *Paulson v. State*, 28 S.W.3d 570 (Tex. Crim. App. 2000))); *see also Gonzalez v. State*, 337 S.W.3d 473, 480 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) (finding a rational juror could believe the appellant sexually assaulted the complainant in resolving conflicting testimony between what the complainant testified to and what she told the sexual-assault-examination nurse)

This Court's role is not to simply compare an appellant's analysis of the evidence against the State's analysis of the same evidence. *Cardenas v. State*, 30 S.W.3d 384, 389 (Tex. Crim. App. 2000). Rather, this Court must uphold the verdict unless a factfinder does not act rationally. *Laster v. State*, 275 S.W.3d 512, 517-518 (Tex. Crim. App. 2009) (stating this Court's role is to guard against this "rare occurrence" where a jury acts irrationally).

II. **The evidence is legally sufficient to support the appellant's conviction for capital murder.**

The jury concluded beyond a reasonable doubt that on or about November 28, 2011, the appellant, either as a principal or a party, unlawfully, while in the course of committing or attempting to commit the robbery of Issaoui or Trelles, intentionally caused the death of Issaoui by shooting Issaoui with a deadly weapon, namely a firearm (CR – 285-95). TEX. PENAL CODE § 19.03(a)(2) (West supp. 2014); *see also* TEX. PENAL CODE § 29.02(a) (West 2011) (A person commits robbery if, in the course of committing theft and with intent to obtain or maintain

control of the property, he intentionally, knowingly, or recklessly causes bodily injury to another, or intentionally or knowingly threatens or places another in fear of imminent bodily injury or death). The record contains evidence from which the jury could rationally find each element of capital murder beyond a reasonable doubt.

A person acts intentionally, or with intent, with respect to a result of his conduct when it is his conscious objective or desire to cause the result. TEX. PENAL CODE § 6.03(a) (West 2011); *Cook v. State*, 884 S.W.2d 485, 490 (Tex. Crim. App. 1994) (noting that murder is a result-oriented offense). A defendant's intent is most often proven through the circumstantial evidence surrounding the crime. *Mouton v. State*, 923 S.W.2d 219, 223 (Tex. App.—Houston [14th Dist.] 1996, no pet.) (citing *Henderson v. State*, 825 S.W.2d 746, 749 (Tex. App.—Houston [14th Dist.] 1992, pet. ref'd)). The jury may infer the requisite intent from a defendant's acts, words and conduct, as well as, the method of committing the crime. *Mouton*, 923 S.W.2d at 223; *Tillman v. State*, 426 S.W.3d 836, 842 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd) (citing *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004)). Intent can also be inferred from the use of a firearm. *See Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996) (holding "the jury may infer the intent to kill from the use of a deadly weapon unless it would not be reasonable to infer that death or serious bodily injury could result from the use of the weapon"); TEX.

PENAL CODE § 1.07 (West supp. 2014) (defining a deadly weapon as a firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury); *see also Manrique v. State*, 994 S.W.2d 640, 649 n. 1 (Tex. Crim. App. 1999) (Meyers, J. concurring) (noting that the inference of intent to kill is almost conclusive when a deadly weapon is used in a deadly manner, but when weapon not dangerous or not used in deadly manner, further evidence is needed).

Here, the evidence showed that Issaoui's cause of death was multiple gunshot wounds (5 RR 70). Phatak testified that Issaoui suffered four separate gunshot wounds: two to the head and two to his body (4 RR 74-75). *See* (St. Ex. 77). Phatak explained that, based on the evidence of soot and stippling on the body, Issaoui was shot at very close range; in one location between two to six inches away, in the second location between three and four feet away, and the third and fourth locations indicated that the muzzle of the gun would have been up against the fabric of Issaoui's clothes before it was fired (5 RR 76-83). Additionally, Roy Glover, a CSU, testified that the bullet found under Issaoui was flat, which indicated that the shooter was over the victim when the gun was fired (3 RR 196). *See* (St. Ex. #20). Thus, the evidence was sufficient to show intent to kill. *See Jones*, 944 S.W.2d at 647; *Sholars v. State*, 312 S.W.3d 694, 703 (Tex. App.—

Houston [1st Dist.] 2009, pet. ref'd) ("When a deadly weapon is fired at close range, and death results, the law presumes an intent to kill.").

The evidence was sufficient for the jury to find the appellant guilty as a principal actor or under some theory of party liability (CR – 289-94). *See Leza v. State*, 351 S.W.3d 344, 357 (Tex. Crim. App. 2011) (noting that when the evidence shows that the appellant is guilty, either as a principal or a party, but his precise role in that offense was unclear, a jury is not required to unanimously determine what his exact party accountability might be). Under the law of parties, the jury could have found the appellant guilty of capital murder if it concluded that the murder was committed by his own conduct, by the conduct of another for which he was criminally responsible, or in an attempt to carry out a conspiracy to commit robbery, the murder was committed in furtherance of that robbery and should have been anticipated. *See* TEX. PENAL CODE §§ 7.01(a), 7.02(a)(2); 7.02(b) (West 2011); *Ervin v. State*, 333 S.W.3d 187, 200 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd).

When, as here, a jury returns a general verdict and the evidence is sufficient to support a guilty finding under any of the allegations submitted, the verdict should be upheld. *Hernandez v. State*, 171 S.W.3d 347, 353 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd). In determining whether the appellant was a party to the offense, a reviewing court examines the events before, during and after the

commission of the offense. *See Ervin*, 333 S.W.3d at 200. And an agreement between parties to act together in common design can be shown by direct or circumstantial evidence. *Id*; *see Wygal v. State*, 555 S.W.2d 465, 469 (Tex. Crim. App. 1977) (circumstantial evidence is sufficient to show guilt as a party).

Here, Trelles testified that when he was working in the game room with Issaoui during the early morning hours of November 28 when two gunmen entered and demanded money (4 RR 83-87). Trelles was able to identify both gunmen. He stated that neither gunman wore anything to cover their face or hands (4 RR 84). As previously discussed, Trelles positively identified the appellant as the gunman who first held a gun to him, demanded money, and later shot him in the leg (4 RR 142-43). *See* (St. Ex. #69, 102). His initial description to police was accurate, and the record reflected that Trelles immediately identified the appellant in a photo spread a week after the robbery after not identifying anyone in previous photo spreads that did not contain the appellant's photo (4 RR 101-3, 113-14, 152-53, 235-36).

Additionally, Trelles testified that he recognized the second gunman "very well" as Edward Broussard, someone he knew before the robbery and Trelles positively identified him in a photo spread (4 RR 90, 135-40). *See* (St. Ex. 65, 66). Moreover, Trelles explained that he had seen Broussard earlier that evening when

27

he had been in the game room with some other friends, including Trelles' friend Singleton (4 RR 69-75).

The evidence established that the appellant acted pursuant to a common course or scheme. Trelles testified that he heard gunshots come from the location where Issaoui was sitting (4 RR 66-67, 70, 77, 82-83). He stated that *immediately* after hearing the shots he exited his office and was faced with a gun (4 RR 82-84). Trelles described that both gunmen used semiautomatic weapons, different from the revolver Issaoui carried that evening (4 RR 95-96). Both Kim and Martin McCoy testified that they heard a gunshot from the front door area of the game room where Issaoui was sitting and saw a man pointing a gun at Trelles, demanding money (4 RR 20-21, 44-45). Trelles testified that the appellant and Broussard both demanded money from him while holding him at gun point (4 RR 83-87). From Trelles' testimony, it was clear the appellant and Broussard were working together.

Additionally, circumstantial evidence revealed that at least Broussard and Singleton had gone to the game room earlier that evening, likely to case it before the robbery (4 RR 69-77). Trelles testified that Broussard used the alias "Chris" when he signed the log sheet and Singleton did not sign it at all (4 RR 72-73). He stated that at some point Singleton lost his phone and that he never found it before leaving with the group (4 RR 73-77). When Singleton returned to the game

room for the second time, this time alone, Trelles noticed that he had a different phone and that he was using it a lot more than usual (4 RR 77-78). Trelles testified that Singleton intervened after the appellant shot him and Broussard pointed a gun at him; he described that Broussard and Singleton got into an argument about what was happening (4 RR 90-91).

Trelles saw the appellant and Broussard leave in the same vehicle and testified that Singleton left shortly thereafter before police arrived (4 RR 92-94). Surveillance videos from surrounding businesses corroborated Trelles' testimony; one video showed a fourth suspect leave Singleton's car during the robbery and sit in the getaway vehicle before the appellant and Broussard drove away (4 RR 191-96). *See* (St. Ex. #73-74).

Moreover, based on the appellant's demands for money and the items taken, the evidence showed that the agreement between the parties was to commit a robbery. Multiple witnesses heard the gunmen demand money from Trelles (4 RR 20-21, 85-87). Trelles stated that the appellant took $1,500 from his office and $1,000 from his pocket (4 RR 85-87). Additionally, the evidence showed that the revolver Issaoui had been carrying that evening was forcibly removed from his gun holster, and the watch he always wore was located off of his wrist on the floor near his body (4 RR 68, 185-86, 188-89; 5 RR 12-14). It also appeared that Issaoui's ring was taken from his finger (5 RR 13-14, 85).

29

Furthermore, the evidence was sufficient to show that as a party to the offense the appellant should have anticipated someone could die in furtherance of the robbery based on the use of firearms. Trelles testified that both the appellant and Broussard held him at gunpoint with semiautomatic firearms, and he described how the appellant shot him in the leg (4 RR 87-96). The ballistics evidence corroborated Trelles' testimony (4 RR 94-96; 5 RR 33-37). *See* (St. Ex. #8). Jennifer Turner, a firearms expert, testified that the four casings that she tested from the scene were likely all fired from the same firearm, a semiautomatic pistol (5 RR 27-34). *See* (St. Ex. #8, 36-39). Therefore, the record reflects that that the appellant, acting with others, entered the game room with the intent to commit a robbery pursuant to one scheme or continuing course of conduct and Issaoui was intentionally killed in furtherance of that scheme. The appellant should have anticipated that when committing a robbery with firearms that someone could be shot and killed. *See Hernandez*, 171 S.W.3d at 354-55. Thus, the evidence was sufficient to support the jury's verdict. *See id.* (holding that the evidence was sufficient to convict appellant of capital murder under the law of parties when physically present at the commission of the offense and encouraged its commission by words or other agreement).

The appellant argues that party liability theory depends on proof that he was a part of the offense and that Trelles' identification alone was insufficient to

30

connect him to the capital murder. (App'nt Brf. 22-25). But the testimony of a single eyewitness can be enough to support a conviction. *Bradley v. State*, 359 S.W.3d 912, 917 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd) (citing *Aguilar v. State*, 468 S.W.2d 75, 77 (Tex. Crim. App. 1971)). As the sole judge of the credibility of the witnesses, the jury weighed the evidence and was free to find guilty without other physical evidence – like DNA or fingerprints – linking the appellant to the crime. *Id.*; *Harmon v. State*, 167 S.W.3d 610, 614 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd).

Finally, to the extent that the appellant argues that the eyewitness expert he presented, Trent Terrell, negated Trelles' identification, the jury was free to believe this testimony or not. *Wyatt v. State*, 23 S.W.3d 18, 30 (Tex. Crim. App. 2000) (noting "reconciliation of conflicts in the evidence is within the exclusive province of the jury." (quoting *Losada v. State*, 721 S.W.2d 305, 309 (Tex. Crim. App. 1986)); *Fuentes v. State*, 991 S.W.2d 267, 271 (Tex. Crim. App. 1999) (stating that trier of fact is sole judge of credibility of eyewitnesses and strength of evidence).

Reviewing the record in the light most favorable to the jury's verdict, there is sufficient evidence for a rational trier of fact to have concluded beyond a reasonable doubt that the appellant was guilty of each element of capital murder. *See Clayton*, 235 S.W.3d at 778-79 (noting that when a record supports conflicting inferences, a reviewing court presumes that the factfinder resolved the conflict in

favor of their verdict); *Powell v.State*, 194 S.W.3d 503, 508 (Tex. Crim. App. 2006); *Jackson*, 443 U.S. at 319. The appellant's third point of error should be overruled.

## REPLY TO APPELLANT'S FOURTH POINT OF ERROR

In the appellant's fourth point of error, he argues that the trial court erred in limiting portions of is expert's testimony regarding the reliability of eyewitness identification. (App'nt Brf. 25-27). The appellant presented Terrell, a psychology professor, as an expert to testify to the possible unreliability of eyewitness testimony (5 RR 89-140). After several objections by the State regarding what Terrell based his testimony upon, a hearing outside of the presence of the jury was held (4 RR 96-99). The following exchange occurred:

> DEFENSE COUNSEL: Back to the question. Witnesses to real life crimes make the same kinds of mistakes as experimental participants. Okay?
>
> TERRELL: Yes.
>
> STATE: And I object to that. It's a conclusion with no foundation laid beforehand.
>
> COURT: Overruled. Let's see what he has to say.
>
> DEFENSE COUNSEL: Okay.
>
> TERRELL: Do you want me –
>
> DEFENSE COUNSEL: Are you basing your information on things – exonerations from the Innocence Project?
>
> TERRELL: Yes.

DEFENSE COUNSEL: Okay. Explain what the Innocence Project is.

TERRELL: Innocence Project is a group that advocates for convicted felons who are incarcerated to have the ability to petition to have their DNA tested in the hopes that it will exonerate them in the crimes that they've been committed for. The reason I didn't call them studies is because they're not really studying this. They are just documenting that this has occurred. There have been over 300 exonerations in the United States based on DNA evidence that was produced after the fact. In around 75% of these – and I say around because they're being added daily and percentages fluctuate. Around 75% of these exonerated convictions were based at least in part on erroneous eyewitness identifications.

(5 RR 99-100). In his argument to the court regarding the admissibility of this testimony, the appellant argued:

I think we're allowed to go into that because the State said during jury selection that it's a minuscule amount of cases that this has happened in. So, I'm trying to show that there's 300 cases that have been exonerated that they know of now.

(5 RR 100-101). The State responded that the number was disingenuous without requiring Terrell to "produce a list of each and every one of the exonerations that he's claiming is, in fact, an exoneration based on both DNA and in part [o]n eyewitness testimony that he could then be cross-examined on" and argued that it was not relevant to whether the eyewitness identification in the current case was done properly (5 RR 101). Ultimately, the trial court held that Terrell could testify to any experiments that he was *personally* involved in or studies he had used in his field, but sustained the State's objection to a discussion about the Innocence

33

Project and numbers of exonerations nationwide because there were too many variables for why someone may be exonerated (5 RR 101-104).

At the trial court's suggestion, Terrell went on to describe the studies he had conducted regarding a "simulated crime or simulated event" outside of the presence of the jury (5 RR 105-106). When asked about the results, Terrell stated, "[M]any of the participants make errors. And depending on the variables introduced, the amount of errors fluctuate, but there are always a number of participants in any study who fail to make a correct identification." (5 RR 106). The following exchange occurred regarding those error rates:

DEFENSE COUNSEL: Do you have percentages?

TERRELL: It's difficult to get into percentages because all crime scenarios are different, and really what we do in our experiments is we work off of baselines. We have a control group in which certain things have happened, and then we modify a variable to see if the correct rate of identification goes up or down. So, it's really a departure from that baseline percentage. So, truthfully, no, I don't because the baseline percentage varies considerably, depending on how long the exposure was, how clear the video was, a number of factors. So, when we're talking about modifying the reliability of identifications, we're talking about a departure from that established baseline for that study. So, I really don't like to get into percentages because it changes for every situation.

DEFENSE COUNSEL: Give us an example of a study.

TERRELL: Okay. So –

STATE: Judge, that I would object to as irrelevant.

THE COURT: Overruled.

TERRELL: Okay. So, we bring in participants. We show everyone the same video and then we produce a lineup that they look at and we show the lineup in three different ways. And I don't know that I need to describe the ways but –

DEFENSE COUNSEL: Go ahead. Describe it.

TERRELL: One would be a simultaneous lineup where you see all the photographs at the same time, like we have in this case. One would be sequential. You show them the photograph one at a time, and they have to make a judgment on that photograph before moving to the next. And what I'm working on right now is a third type of lineup where they see them in a continuous loop. I call it a slide show. So, photos are moving along one at a time and they're just watching this. And we would then ask them to identify who they think committed the crime. We would ask them to give a confidence rating of how certain they are, and we would compile the data and see who does better in which group. And those percentages vary, based on which video we're using, what kind of delay we're using. And so the percentages are a little too literal to give as an example that represents all of them. But you get different percentages of people making correct identifications in all three of those groups.

DEFENSE COUNSEL: Do you have people who make incorrect identifications?

TERRELL: Yes.

DEFENSE COUNSEL: And do you know the percentage?

TERRELL: Again, it's –

STATE: Asked and answered.

THE COURT: Sustained. He says he can't give percentages.

DEFENSE COUNSEL: Can you tell us if it's over 50% or under 50%?

TERRELL: Sometimes it's over 50%. Again, it depends on how challenging we're making it, how long we make them wait, for example.

DEFENSE COUNSEL: Depends on the circumstances?

TERRELL: Uh-huh, yes.

STATE: Judge, in front of the jury, I would object to him giving percentages because of the variables that he has cited and relevance to this case.

THE COURT: I'll sustain that objection, as to the percentages.

(5 RR 106-109). At the conclusion of the hearing, the trial court held that Terrell could testify as an "expert about what he knows about this case and what his criticism or what his expert opinion is with regard to the way this was conducted and whether there's a likelihood because of the way it was conducted in this case it could be a misidentification." (5 RR 110-11).

In front of the jury, Terrell described the experiments he had personally conducted that dealt with identification (5 RR 111-12). Additionally, he testified about the different photo spreads he has used and which he preferred based on different studies (5 RR 112-15). Furthermore, Terrell testified about his review of the identification in the present case and the potential issues (5 RR 112-26). He based his opinion on the type of photo spread used, the 10 days between the crime and identification, Trelles' gunshot wound causing him stress, weapon focus, cross

36

racial identification, and the differences in the participants in the photo spread (5 RR 112-26).

## I.    Standard of Review and Applicable Law

The trial court's ruling on the admissibility of evidence is subject to an abuse of discretion standard on appeal. *Shepherd v. State*, 273 S.W.3d 681, 684 (Tex. Crim. App. 2008); *Apolinar v. State*, 155 S.W.3d 184, 186 (Tex. Crim. App. 2005). This includes the admissibility of expert testimony. *See* TEX. R. EVID. 104(a). A trial court's ruling will be upheld if it was within the zone of reasonable disagreement. *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000); *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990). In addition, the appellate court must review the trial court's ruling in light of what was before the trial court at the time the ruling was made. *Id.*; *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010); *Morales v. State*, 32 S.W.3d 862, 865 (Tex. Crim. App. 2000) ("An appellate court should not disturb the trial court's decision to admit or exclude scientific evidence absent an abuse of discretion.").

A trial court serves as the gatekeeper and determines the reliability and relevance of an expert's testimony. *See* TEX. R. EVID. 702; *Kelly v. State*, 824 S.W.2d 568 (Tex. Crim. App. 1992); *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011). The focus of the reliability analysis is to determine "whether the evidence has its basis in sound scientific methodology such that testimony about junk

science is weeded out." *Tillman*, 354 S.W.3d at 435 (internal quotes omitted).

Whereas, the standard for relevance is whether the scientific principals "will assist the trier of fact" and are "sufficiently tied" to the pertinent facts of the case. *Jordan v. State*, 928 S.W.2d 550, 555 (Tex. Crim. App. 1996).

> **II.    The excluded expert testimony was not sufficiently tied to the facts to be helpful to the jury.**

The appellant argues that the trial court erred in limiting Terrell's testimony regarding exonerations of eyewitness based convictions from the Innocence Project's database and the error rates among the eyewitnesses in his simulated crimes. (App'nt Brf.  25-26). But Terrell failed to sufficiently tie this information to the present case in order to be helpful to the jury.

An expert must make an effort to tie pertinent facts of the case to the scientific principles that are the subject of his testimony so as to be helpful to the trier of fact. *Jordan*, 928 S.W.2d at 555 (noting that it was a matter of application not a matter of proof); *Baldree v. State*, 248 S.W.3d 224, 230 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd) (noting that generic testimony and general studies are not sufficient unless they are connected to the facts of the case). Although relevant, evidence may be excluded under Texas Rule of Evidence 403 if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. *See* TEX. R. EVID. 403; *Morales*, 32

S.W.3d at 865 (noting that even if a trial judge finds the proposed expert testimony meets both the Rule 401 and Rule 702 requirements, the judge must perform a Rule 403 analysis to determine whether the evidence should be presented to the jury).

First, regarding the exclusion of testimony about the Innocence Project's database of exonerations, Terrell testified that there had been over 300 exonerations nationwide based on DNA evidence produced after the fact, but stated that the reasons for these exonerations varied (5 RR 103-105). He testified that he could not provide a list of the exonerations because he did not know all of them (5 RR 100-103). Furthermore, Terrell could not provide a study that relied on this information and stated that this information was just to show that exonerations happen in "real life" (5 RR 102-103). Therefore, Terrell failed to tie the statistical information of the Innocence Project's number of exonerations to the facts of *this* case. *See Rousseau v. State*, 855 S.W.2d 666, 686 (Tex. Crim. App. 1993) (concluding that testimony was not relevant where expert only referred to "studies" and did not discuss whether any factors he planned to testify to would apply to specific facts of the case).

Moreover, even if relevant, the evidence was inadmissible under Rule 403. Just stating that the Innocence Project notes that some of the 300 exonerations are due "in part" to erroneous eyewitness testimony without explaining each one

would tend to impress the jury in an irrational but nevertheless indelible way (5 RR 100-105). *See* TEX. R. EVID. 403; *Montgomery*, 810 S.W.2d at 389–90 (noting the factors to consider are (1) the probative value of the evidence; (2) the potential to impress the jury in some irrational yet indelible way; (3) the time needed to develop the evidence; and (4) the proponent's need for the evidence). And most notably, it would require an immense amount of time to go through the facts of each of the 300 exonerations, showing the similarities and differences to the present case; the testimony would have taken over the trial. *See id.* Furthermore, the appellant did not need this testimony, Terrell already testified that there were documented cases in which exonerations had taken place due to misidentification (5 RR 98). Therefore, the trial court did not abuse its discretion in limiting this portion of Terrell's testimony.

Second, regarding the exclusion of testimony about the error rates of Terrell's own study, there was no testimony for the trial court to exclude. Though asked multiple times, Terrell could not testify to a percentage of those he studied who made a false identification (5 RR 106-108). When specifically asked to give an error rate, Terrell testified, "It's difficult to get into percentages because all crime scenarios are different, and really what we do in our experiments is we work off of baselines." (5 RR 106). He went on to say, "I really don't like to get into percentages because it changes for every situation" and that "percentages vary" (5

40

RR 106-108). When the appellant specifically asked if it would be over or under 50%, Terrell again reiterated that it depended on the circumstances (5 RR 108). Because Terrell could not testify to an error rate or percentage, he failed to tie it to the pertinent facts of this case so as to be helpful to the jury. *See Rousseau*, 855 S.W.2d at 686. Therefore, the trial court did not abuse its discretion in excluding this testimony. The appellant's fourth point of error should be overruled.

III.   **The appellant failed to show he was harmed by the limited exclusion of Terrell's testimony.**

Even assuming the testimony should have been admitted, the appellant was not harmed. Under Rule 44.2(b) of the Texas Rules of Appellate Procedure, any non-constitutional "error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." TEX. R. APP. P. 44.2(b); TEX. R. EVID. 103; *Walters v. State*, 247 S.W.3d 204, 218-19 (Tex. Crim. App. 2007). Courts have determined that substantial rights are not affected by the erroneous exclusion of evidence "if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect." *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002); *Ray v. State*, 178 S.W.3d 833, 836 (Tex. Crim. App. 2005) (noting "evidentiary rulings rarely rise to the level of denying the fundamental constitutional rights to present a meaningful defense" (citing *Potier v. State*, 68 S.W.3d 657, 663 (Tex. Crim. App. 2002))). The exclusion of evidence that furthers an appellant's defensive theory only incrementally is non-

41

constitutional error. *Broussard v. State*, 434 S.W.3d 828, 835 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd).

A factor to be considered in a harm analysis is if the same or similar evidence is admitted without objection at another point in trial. *Chapman v. State*, 150 S.W.3d 809, 814 (Tex. App.—Houston [14th Dist.] 2004, pet ref'd) (citing *Mayes v. State*, 816 S.W.2d 79, 88 (Tex. Crim. App. 1991)). Here, Terrell was allowed to testify about the psychology of eyewitness identifications and how certain factors may contribute to false identifications (5 RR 92-94, 116-26). He explained that memory is not perfect and that it can be manipulated by several variables, and he testified that there are documented cases of exonerations (5 RR 94-95, 98). Additionally, Terrell explained his studies that he had conducted on the topic as well as other studies he was familiar with and how a simultaneous photo spread, like the one used in this case, is more susceptible to misidentification and not preferred (5 RR 111-16).

Furthermore, Terrell testified that he had reviewed the documents from this case and pointed out the variables present that could have caused Trelles to make a false identification (5 RR 116-26). Therefore, any error in excluding the Innocence Project's numeral data or Terrell's study's error rate would be harmless because the same or similar evidence was admitted elsewhere. *See Broussard*, 434 S.W.3d at 836 (finding harmless error when the trial court excluded testimony

42

regarding whether synthetic marijuana and marijuana smelled different, after the lab analyst already testified that synthetic marijuana has a fruity smell and the officer testified it did not smell like marijuana); *Montgomery v. State*, 383 SW3d 722, 727-28 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (finding harmless error when the trial court excluded expert testimony regarding the angle of a lane change that was admitted later without objection).

The exclusion of evidence did not preclude the appellant from presenting a defense. As previously stated, Terrell testified regarding the unreliability of eyewitness testimony and specifically the issues he saw in the present case (5 RR 89-99, 111-26). The appellant cross-examined witnesses on Trelles' description of the suspect and how he only saw the appellant for a matter of minutes (4 RR 152-57, 231-35). Moreover, during closing arguments, the appellant addressed at length the issues with Trelles' description and the possibility it was Fisher's husband and friends that robbed the game room (6 RR 14-19). Therefore, even if the trial court erred in sustaining these evidentiary objections, the error did not have a substantial and injurious effect or influence in determining the jury's verdict. *Tillman v. State*, 376 S.W.3d 188, 201-202 (Tex. App.—Houston [14th Dist.] 2012, no pet.). The appellant's fourth point of error should be overruled.

43

## CONCLUSION

It is respectfully submitted that all things are regular and the conviction should be affirmed.

DEVON ANDERSON
District Attorney
Harris County, Texas


/s/ _Katie Davis_____

KATIE DAVIS
Assistant District Attorney
Harris County, Texas
1201 Franklin Street, Suite 600
Houston, Texas 77002
Telephone (713) 274-5826
Fax Number (713) 755-5809
Davis_Katie@dao.hctx.net
State Bar Number: 24070242

# CERTIFICATE OF SERVICE AND COMPLIANCE

This is to certify that: (a) the word count function of the computer program used to prepare this document reports that there are 10,579 words in it; and (b) a copy of the foregoing instrument will be served by efile.txcourts.gov to:

Thomas J. Lewis
1602 Washington Ave.
Houston, TX 77007
Tjlaw2@comcast.net

/s/ _Katie Davis_____

**KATIE DAVIS**
Assistant District Attorney
Harris County, Texas
1201 Franklin Street, Suite 600
Houston, Texas 77002
Telephone (713) 274-5826
Fax Number (713) 755-5809
Davis_Katie@dao.hctx.net
State Bar Number: 24070242

Date: December 15, 2015

45